## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————  )
                                                      )
**MANCH MCLAUGHLIN,**              )
                                                      )
      **Plaintiff,**                        )        **Civil Action No.**
                                                      )        **07-40118-FDS**
      **v.**                                   )
                                                      )
**NATIONAL GRID USA,**                )
                                                      )
      **Defendant.**                      )
———————————————————  )

## MEMORANDUM AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action alleging unlawful discrimination on the basis of race. Plaintiff Manch McLaughlin, an African-American, alleges that his employer, National Grid USA, (1) discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981 (Counts I and II), and (2) retaliated against him because of his complaints of discrimination in violation of Title VII and § 1981 (Counts IV and VI). The Court's jurisdiction arises under 28 U.S.C. § 1331, and venue is proper because National Grid maintains its principal place of business in Westborough, Massachusetts. (Compl. ¶¶ 1, 11).

McLaughlin first contends that National Grid discriminated against him in two ways: by denying him three promotions because of his race, and by conducting a sham investigation after he filed an internal complaint. McLaughlin further contends that National Grid retaliated by unfairly disciplining him and by subjecting him to a hostile work environment after he filed a charge of

discrimination with the Equal Employment Opportunity Commission.

National Grid contends that McLaughlin was denied promotions because others were more qualified and he did not interview well, and that it conducted an appropriate internal investigation into his complaint.  It denies that he was wrongfully disciplined or that he was subjected to a hostile work environment.

National Grid has moved for summary judgment on both discrimination claims and both retaliation claims.  It has also filed a motion to strike various paragraphs of the affidavit McLaughlin filed in support of his opposition to National Grid's summary judgment motion.  For the reasons set forth below, the motion to strike will be denied and the motion for summary judgment will be granted in part and denied in part.

## I.    Background

The following facts are presented in the light most favorable to plaintiff, except as noted.

### A.    McLaughlin's Employment with National Grid

National Grid is an energy delivery company that, among other things, provides natural gas service to more than 500,000 customers in upstate New York.  (App. at 98).[1]  It hired Manch McLaughlin in 1981.  (*Id.* at 2).  McLaughlin initially worked in a series of jobs including janitor and meter reader; in 1983, he obtained a job in the Albany, New York steam station.  (*Id.* at 3). In 1994, the Albany steam station was closed, and McLaughlin transferred to the Gas Operations Department ("Gas Ops") in Glenmont, New York, where he obtained a job as a Gas Mechanic Helper.  (*Id.* at 4-5).  By 1998, McLaughlin had obtained the position of Gas Mechanic C, which

---

[1] Cites to "App." refer to the materials in the Appendix of Exhibits attached to defendant's motion for summary judgment, the authenticity of which are not in dispute.

he held until 2001.  (*Id.* at 6-7).  In May 2001, McLaughlin obtained the position of Chief Gas

Mechanic A, a job he continues to hold today.  (*Id.* at 9-10).

      As a Chief Gas Mechanic A, McLaughlin works out of the Gas Supply Department in

North Albany, New York.  He operates a "sniffer" truck, which is a mobile unit designed to

detect gas leaks.  (*Id.*).  Upon detection of a leak, McLaughlin is responsible for filling out gas

leak cards and dispatching Gas Ops employees to handle the repair.  (*Id.*).

      In March 2005, the Gas Supply Department was combined with Gas Ops, and McLaughlin

was transferred from the North Albany facility back to the Glenmont facility.  (*Id.* at 22-23).

After returning to Glenmont, McLaughlin continued to operate the sniffer truck and perform his

other responsibilities.  (*Id.* at 23-24; McLaughlin Aff. ¶ 14).  According to McLaughlin, the Gas

Ops work performed today is substantially similar to the Gas Ops work he performed prior to his

May 2001 transfer to the Gas Supply Department.  (Pl.'s Opp. at 2).  **B.     The Glens**

**Falls Position**

      In June 2005, National Grid posted a position for a Gas Operations Supervisor in its Glens

Falls, New York location (the "Glens Falls Position").  (App. at 79).  Scott Ackerman was the

superintendent responsible for that location, and therefore was the hiring manager responsible for

filing the position.  (*Id.*).  Gas Operations Supervisors are considered management positions

within National Grid and are not covered by the collective bargaining agreement.  (*Id.* at 24-25,

79).  As a result, an application for such a position is not governed by the collective bargaining

post-and-bid procedure.  (*Id.*).

      The primary duties of a Gas Operations Supervisor include supervising, planning,

scheduling, and coordinating the work of employees engaged in the operation, construction, and

maintenance of gas facilities, as well as monitoring gas operation, construction, and maintenance activities to ensure compliance with National Grid's standards and operating procedures.  (*Id.* at 84, 99, 107; Pl.'s Resp. to Def.'s St. of Material Facts [hereinafter "Pl.'s Resp."] ¶ 26-27).  The Supervisors are also responsible for correctly implementing the code and regulations of the New York Public Service Commission regarding natural gas delivery services.  (*Id.*).  They must utilize their skills and judgment to evaluate conditions in the field, and prioritize the work of the Gas Ops crews to ensure that the most serious leaks are addressed the most quickly to protect public safety.  (*Id.*).

McLaughlin applied for the Glens Falls Position.  He was interviewed by Ackerman and another National Grid employee on July 25, 2005.  (App. at 79, 84, 88).  Ackerman decided not to interview two white employees whom he considered unqualified.  (*Id.* at 79).  Six interviews were conducted, after which Ackerman compiled a chart ranking the candidates in a variety of categories.  (*Id.*).  McLaughlin scored 285, the lowest of all interviewees.  (*Id.* at 79, 86).  No other candidate scored below 360 points.  (*Id.* at 86; Pl.'s Resp. ¶ 28-32).[2]

In approximately August 2005, after consulting with the Manager of Operations and an individual in the human resources department, Ackerman hired a white man, Kevin Krough, for the Glens Falls Position.  (App. at 80-81; Pl.'s Resp. ¶ 38).[3]  Krough was the individual who

---

[2] In Ackerman's view (which McLaughlin disputes), McLaughlin performed particularly poorly on the "Task Performance" category, "which was a core competency considered for the position comprised of technical knowledge and expertise."  (App. at 79, 86).  According to Ackerman, some of McLaughlin's answers in the interview were unresponsive to the questions and unrelated to the workplace.  (*Id.* at 79).  For example, when asked about a project he had worked on, McLaughlin responded that he had been a landlord for more than 20 years.  (*Id.* at 79, 89).  In addition, McLaughlin was unable to provide specific answers to technical questions, instead referring to National Grid's Standards Book.  (*Id.* at 80, 88-97).

[3] According to McLaughlin, the human resources employee with whom Ackerman consulted was Dennis Flood.  (McLaughlin Aff. ¶ 23).

4

scored highest on the ranking chart.  (*Id.* at 80-81; Pl.'s Resp. ¶ 38).  According to Ackerman, McLaughlin was not selected because of his poor performance during the interview, and because his most recent experience was confined to operating the sniffer truck, whereas a Gas Operations Supervisor would have a much broader range of responsibilities.  (App. at 80).[4]  Ackerman denies that McLaughlin's race played any role in the decision.  (*Id.*).

McLaughlin vigorously disputes the accuracy of Ackerman's evaluation.  (Pl.'s Resp. ¶ 33-37; Pl.'s Opp. at 2-3; McLaughlin Aff. ¶ 16-19).  He contends that the interview was "entirely subjective" and that Ackerman selectively recorded his answers to the questions, choosing to include those that reflected poorly and exclude those that reflected favorably.  (Pl.'s Resp. ¶ 33-37; Pl.'s Opp. at 2-3; McLaughlin Aff. ¶ 16-19).  He also contends that Ackerman minimized his experience and qualifications by ignoring the fact that he had more than seven consecutive years of field experience prior to being transferred to the Gas Supply Department in 2001.  (Pl.'s Resp. ¶ 37).

C.    **The Glenmont Positions**

In August 2005, National Grid posted two additional Gas Operations Supervisor positions in its Glenmont, New York facility (the "Glenmont Positions").  (App. at 100, 107).  David Zielinski was the superintendent assigned to that facility and therefore was the hiring manager for the two positions.  (*Id.*).

McLaughlin applied for both positions.  (*Id.* at 15-16).  Of the ten candidates who

---

[4] At the time he was hired, Krough had spent nearly twenty years in Gas Ops, including thirteen years as a Gas Mechanic C and two years as a Chief Gas Mechanic in Gas Ops (which was essentially a working foreman position, in which he regularly supervised a crew of gas mechanics).  (App. at 80-81; Pl.'s Resp. ¶ 40).

submitted applications, Zielinski chose to interview five.  (*Id.* at 101).[5]  McLaughlin was not

selected for an interview.   (*Id.* at 100).   Ultimately, Zielinski hired two white employees, Anthony

Cianfarani and Anthony Savona, to fill the positions.  (*Id.* at 101).

      According to Zielinski, he did not interview or hire McLaughlin because of his poor

performance in the Glens Falls interview a few weeks earlier and because he was familiar with

McLaughlin from other interviews in 2002 and 2003.  (*Id.* at 99-101).  Zielinski denies that race

played any role in the hiring decision.  (*Id.* at 100).  Zielinski states that he hired Cianfarani and

Savona because they were more qualified.  (*Id.* at 101).  According to National Grid, both had

"extensive" experience in Gas Ops.  (*Id.* at 101-02, 119, 143).  Cianfarani had worked in Gas Ops

from 1992 through 2004; he had experience with the drilling and tapping truck, a specialized

piece of equipment used to drill extensions for gas pipes; and he had been selected for a

management position as a Technical Trainer who trained Gas Ops personnel.  (*Id.* at 102, 143-

44).  Savona had worked in Gas Ops since 1992 and had also been a Seasonal Construction

Foreman, supervising a crew of employees in gas construction activities.  (*Id.* at 101-02, 119-20).

      Both Cianfarani and Savona had interviewed for the Glens Falls Position a few weeks

earlier.  (*Id.* at 86, 102-03, 109).  At the Glens Falls interview, Cianfarani had achieved the

second-highest score (377.5), finishing one position behind Krough, the individual who was

ultimately hired.  (*Id.* at 86).  Based on that performance, Zielinski did not feel a need to interview

Cianfarani again after he applied for the Glenmont Position.  (*Id.* at 102).  By contrast, Savona

had not scored as well at the Glens Falls interview—he placed fourth out of the six with a score of

---

[5] National Grid notes that of the five candidates not interviewed, four were white.  (App. at 101).
However, one of the white candidates who did not receive an interview—Anthony Cianfarani —was nevertheless
promoted to one of the Glenmont Positions.  (*Id.* at 55).

360—so Zielinski decided that another interview would be required. (*Id.* at 86, 102). According to Zielinski, his primary concern with Savona was his communications skills, but he had learned that Savona had recently taken classes in an effort to improve those skills. (*Id.* at 102-03).

McLaughlin contends that he was equally, if not more, qualified for the positions than Cianfarani or Savona. (McLaughlin Aff. ¶ 34, 36). He notes that at the time of the interviews, he had nearly twenty-five years of experience with National Grid, and that seven of those years were spent working in Gas Ops. (*Id.* ¶ 34). Moreover, McLaughlin notes that he was not interviewed for the Glenmont Position while Savona was, even though neither had scored in the top fifty percent of applicants for the Glens Falls Position. (*Id.*; Pl.'s Resp. ¶ 56-57; McLaughlin Aff. ¶ 68(a)).[6]

**D.    The Internal Complaint**

On September 23, 2005, McLaughlin filed a complaint with National Grid's Human Resources Department concerning the decision not to interview him for the Glenmont Positions. (App. at 29). He sent a letter to Wanda Grace, Manager of Labor Relations for National Grid. (*Id.* at 31, 112, 117-18). In addition to focusing on labor-management relations under the collective bargaining agreement, Grace is sometimes called upon to investigate or assist in the investigation of allegations of race discrimination. (*Id.* at 112; Dkt. No. 45, Grace Dep. at 17). In the investigation of McLaughlin's complaint, Grace was assigned to assist Dennis Flood. According to McLaughlin, Flood participated in the earlier decision not to hire him for the Glens

---

[6] McLaughlin also alleges that Savona is known to have made racially insensitive remarks. (McLaughlin Aff. ¶ 40, 42, 45). He contends that Savona has repeatedly used the word "nigger" in the company of African-American co-workers, and that Zielinski—his supervisor and the individual in charge of hiring for the Glenmont Positions—failed to take any action even though he was aware of it. (*Id.* ¶ 45-48, 68(b)). Those statements apparently occurred *after* Savona was hired for one of the Glenmont Positions. (*Id.* at 41, 46, 47).

Falls Position.  (App. at 112; Dkt. No. 45, Grace Dep. at 28; McLaughlin Aff. ¶ 23).

Grace and Flood met with McLaughlin to discuss his allegations.  As a result of that meeting, they decided to focus their investigation on the decision not to interview him for the Glenmont Positions.  (App. at 113; Pl.'s Resp. ¶ 68).  On November 16, 2005, the investigation ended; Grace and Flood concluded McLaughlin's race was not a factor in Zielinski's decision not to interview him, and that he was not selected because National Grid considered other employees more qualified.  (App. at 113).

Shortly thereafter, Grace and Flood met with McLaughlin to convey their findings.  (*Id.* at 113-14; McLaughlin Aff. ¶ 57).  According to McLaughlin, the first thing Grace said at the meeting was:  "Manch, I'm just gonna tell it to you like it is. . . . Every time black people don't get the position that they think they deserve, the first thing they cry is discrimination." (McLaughlin Aff. ¶ 57; App. at 113-14).[7]  Grace is herself African-American.  (App. at 112). McLaughlin was also troubled that Flood had conducted the investigation despite the fact that he had been involved in the earlier decision not to hire McLaughlin for the Glens Falls Position. (McLaughlin Aff. ¶ 56).

**E.    The Audit**

In late 2005, at the instigation of the New York Public Service Commission, National Grid performed an internal audit that revealed that the company could do a better job maintaining its

---

[7] Grace admits to making a similar statement, but denies its negative implications.  According to Grace, she was trying to acknowledge McLaughlin's frustration with not initially being offered an explanation of why he had not been interviewed for the Glenmont Positions.  In so doing, she said words to the effect of, "When African American employees apply for positions for which they believe they are qualified, are unsuccessful and receive little or no feedback about their unsuccessful candidacy, the first thing they assume is 'discrimination,' rather than looking at the facts."  (App. at 113-14).  In this summary judgment setting, the Court necessarily assumes McLaughlin's version of events.

paperwork, particularly its leak cards.  (App. at 103; Pl.'s Resp. ¶ 75-76).  National Grid

attempted to enhance the accuracy and completeness of its paperwork, and the paperwork of all

employees was subject to increased oversight.  (App. at 103; Pl.'s Resp. ¶ 77).

###### F.      The January 24, 2006, Coaching and Counseling Session

On January 24, 2006, McLaughlin was required to attend a "coaching and counseling"

session led by James Jansen.  (App. at 37, 137).  A "coaching and counseling" session is an

informal discussion between a supervisor and an employee designed to address job performance

issues.  (*Id.*).  At the session, Jansen alleged that McLaughlin had been making substantial errors

with respect to the completion of his leak cards.  (*Id.* at 137).  McLaughlin acknowledged certain

mistakes, but also contended that some of the problems were not his responsibility.  (*Id.* at 38,

132).  Jensen agreed.  (*Id.*).  Jansen was unaware at the time of this session that McLaughlin had

made a complaint of discrimination.  (*Id.* at 132).

###### G.      Savona Becomes McLaughlin's Supervisor

In February 2006, Gary Stevens, who is African-American, joined Gas Ops and replaced

Jansen as the lead Gas Operations Supervisor.  (App. at 120; Pl.'s Resp. ¶ 87).  As a result of the

change, Savona assumed primary responsibility for supervising leak history card compliance in

Gas Ops.  (App. at 121).  Although all employees were subject to increased oversight, Savona

"zeroed in" and "turned the heat up" on McLaughlin.  (Dkt. No. 43-5, Stevens Dep. at 41; *see*

McLaughlin Aff. ¶ 77-83).  According to Stevens, Zielinski instructed Savona to "turn the heat

up" on McLaughlin.  (Dkt. No. 43-5, Stevens Dep. at 41).[8]  He met weekly with McLaughlin

during February to discuss completed leak cards, and to discuss a time line for repair of

_____

[8] Zielinski denies having so instructed Savona.  (App. at 104, 120).

discovered leaks.  Upon completion of these meetings, Savona would keep possession of the leak

cards, thereby denying McLaughlin the opportunity to address the leaks.  When the leaks

ultimately went unrepaired, Savona blamed McLaughlin for failing to order the repairs.

(McLaughlin Aff. ¶ 79-83).  During all these interactions, Savona was aware that McLaughlin had

filed a discrimination complaint.  (Dkt. No. 45, Grace Dep. at 38-39).[9]

### H.   The March 27, 2006 Reminder

On March 27, 2006, Savona issued McLaughlin a formal oral reminder for having

misclassified a leak and for having paperwork out of compliance.  (App. at 121, 126).  An oral

reminder is the first step in National Grid's progressive disciplinary procedure under the collective

bargaining agreement.  (Def.'s St. of Material Facts [hereinafter "Def.'s St."] ¶ 95).  In the

meeting to discuss the oral reminder, McLaughlin admitted to the misclassification, but disputed

whether his paperwork was out of compliance.  (App. at 52-55).  The reminder was placed in

McLaughlin's file, where it remained for a period of six months.  (Id. at 122).

Although other white employees received "coaching and counseling" sessions regarding

their leak cards, McLaughlin states that he was the only employee to receive an oral reminder.

(App. at 43, 122; Pl.'s Resp. ¶ 98).[10]  On May 4, 2006, Savona told McLaughlin that he was

_____

[9] Savona denies knowing, during the February 2006 interactions, that McLaughlin had previously filed an internal discrimination complaint.  (App. at 121).  Grace, however, testified that as part of her investigation, she met with and interviewed Savona.  (Dkt. No. 45, Grace Dep. at 38-39).  For the purposes of summary judgment, the Court will infer that Savona had knowledge of the complaint during February.

[10] Stevens and Cianfarani state in their affidavits that other employees did receive oral reminders.  (App. at 140, 144).  By contrast, Savona—who was responsible for giving McLaughlin his oral reminder—states that he disciplined other employees with informal coaching and counseling sessions, not with oral reminders.  (Id. at 122).  Moreover, in his deposition (which National Grid filed in support of its motion), McLaughlin states that he is "quite sure" other individuals did not receive oral reminders as he did.  (Id. at 43).  The Court will therefore assume, for summary judgment purposes, McLaughlin's version of events.

doing a "good job" on the leak cards.  McLaughlin responded by asserting that Savona did not

truly believe the positive feedback and that he was being "set up."  (App. at 57; Pl.'s Resp.

¶ 104).

### I.      The EEOC Charge

On May 4, 2006, McLaughlin filed a charge of discrimination with the EEOC.  (App. 148-

49).  He contended that he was denied various promotions on account of his race dating back to

at least 2001, and specifically identified his failure to be hired for the Glens Falls Position and the

two Glenmont Positions.  (*Id.* at 148).  He also objected to the conduct of the internal

investigation, pointing in particular to Grace's statement concerning black people and

discrimination.  (*Id.*).  He complained that his supervisors were retaliating by unfairly requiring

him to meet regularly to discuss his leak cards even though they were not doing to same to other

employees.  (*Id.* at 149).  Finally, he pointed to the oral reminder placed in his file on March 27,

2006, and noted that no other person had been written up for the same conduct.  (*Id.*).

### J.      The May 19, 2006 Performance Review

On May 19, 2006, McLaughlin received a performance review.  (App. at 58, 128-29).

The review was completed by Savona, Cianfarani, and Stevens.  (Dkt. No. 43-7, Savona Dep. at

30-31).[11]  Of the twenty-three categories in which he received scores, McLaughlin "exceeded

expectations" in one category, "met expectations" in seventeen, and "needed improvement" in

five.  (App. at 128-29).  Savona also informed McLaughlin that he "need[ed] to be focused more

on details."  (*Id.* at 122, 129; Dkt. No. 43-7, Savona Dep. at 25).  McLaughlin disagreed with the

---

[11] Stevens could not recall participating in the review or in preparing the associated documents.  (Dkt. No. 43-5, Stevens Dep. at 18).  Although Savona's affidavit states that the review included input from Jansen, in his deposition, Savona testified that Jansen as not involved.  (App. at 122; Dkt. No. 43-7, Savona Dep. at 30).

evaluation. (App. at 129).[12]  In particular, McLaughlin noted that prior to the May 2006 review,

he had never received a negative performance evaluation during his many years at National Grid.

(McLaughlin Aff. ¶ 122).

### J.     The Stuffed Gorilla

In May 2007, McLaughlin discovered a stuffed gorilla in the locker room at the Glenmont

facility. (App. at 68-69; McLaughlin Aff. ¶ 114). He was offended by the gorilla and complained

about it to Stevens. (App. at 140).[13]

### L.     Savona Is Transferred

In April 2008, Savona was transferred to a Schenectady, New York facility after he had

made a racially insensitive comment to an African-American employee, William Hardy, and

repeated that comment in front of two other African-American employees, Kelvin Melton and

Steve Bryant. (Id. at 123). Savona first said to Hardy something to the effect of, "you scared me

with your smile." (Id.; Pl.'s Resp. ¶ 122). A few days later, Hardy approached Savona while he

was standing with Melton and Bryant, at which point Savona said words to the effect of, "You

almost scared me like you did before, when you smiled at me." (App. at 123; Pl.'s Resp. ¶ 124).

Following Hardy's complaint, Savona was transferred. (App. at 123).

--------

[12] McLaughlin did not receive another performance review from Savona until 2008. (Id. at 61). In that review, he generally met expectations. (Id.). McLaughlin conceded that the 2008 review was a fair and accurate portrayal of his job performance at that time. (Id.).

[13] Stevens, who is also African-American, testified that he was not offended by the gorilla, which had a pink ribbon on it with the words "party animal." (App. at 140). According to Stevens, the white employee who placed it there (Mike Warner) meant it as a joke regarding another white employee who had a reputation of enjoying parties. (Id.).

According to McLaughlin, Warner has a history of making racially insensitive comments, including calling then-President-Elect Barack Obama a "nigger" in late 2008. (McLaughlin Aff. ¶ 118-19). McLaughlin states that Warner was removed from his position as a union steward for the comment. (Id.).

## II.      Procedural History

McLaughlin filed the present action on April 20, 2007.  His six-count complaint alleges (1) discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) discrimination on the basis of race in violation of  42 U.S.C. § 1981; (3) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623; (4) unlawful retaliation in violation of 42 U.S.C. § 2000e; (5) intentional infliction of emotion distress; and (6) unlawful retaliation in violation of 42 U.S.C. § 1981.  National Grid has moved for summary judgment on all counts except Count III, the ADEA claim.[14]

## III.     Analysis

### A.      Motion to Strike

As an initial matter, National Grid moves to strike various paragraphs of McLaughlin's affidavit.  It asserts that certain portions of McLaughlin's affidavit are inadmissible because (1) they are not based on personal knowledge, (2) they are based on opinion or speculation, and/or (3) they contain hearsay.

The Court will deny the motion to strike, as it is not necessary to reach the issue.  Even assuming the paragraphs challenged by National Grid are *admissible*, McLaughlin has still failed to meet his burden of showing pretext as to his failure-to-promote claims.  On the other hand, even assuming the paragraphs challenged by National Grid are *inadmissible*, McLaughlin has made out both claims of discrimination based on the internal investigation and claims of

---

[14] National Grid argues that McLaughlin's claim for intentional infliction of emotion distress is entirely dependent upon the discrimination and retaliation claims and thus, if those claims are dismissed, so too must that claim.  (Def.'s Mem. at 20).  Because that is National Grid's only argument in favor of dismissal of Count V, and because the Court will not dismiss the internal investigation discrimination claim or the retaliation claims, it will deny the motion for summary judgment on the claim for infliction of emotional distress.

retaliation.

**B.      Summary Judgment Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (quotation omitted).  Summary judgment is appropriate when "the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB*

*Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986)).  In making this determination, the Court views "the record in the light most

favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*,

556 F.3d 20, 25 (1st Cir. 2009).

**C.      Race Discrimination Claims**

The complaint alleges that National Grid discriminated against McLaughlin based on his

race in violation of both Title VII (Count I) and 42 U.S.C. § 1981 (Count II).  Although

McLaughlin has asserted separate claims under Title VII and § 1981, the analysis of both claims is

governed by an identical analytical framework. *Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir.

2008).  Accordingly, the Court will consider the two claims together.

Where no direct evidence of discriminatory animus and causation exists, a plaintiff may

establish the necessary elements by circumstantial evidence using the three-stage burden-shifting

14

method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See*

*Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004).  Under this framework, plaintiff must

first establish a *prima facie* case of discrimination.  *Straughn v. Delta Air Lines, Inc.*, 250 F.3d

23, 33 (1st Cir. 2001).  Once the plaintiff establishes a *prima facie* case, the burden shifts to the

employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.

*Id.*  If the employer articulates such a reason, the burden shifts back to the employee to show that

the proffered reason was mere pretext, and that the true reason was unlawful discrimination.  *Id.*

at 34.  Thus, "[a]t the summary judgment stage, the plaintiff must produce evidence to create a

genuine issue of fact with respect to two points:  whether the employer's articulated reason for its

adverse action was a pretext and whether the real reason was . . . discrimination."  *Quinones v.*

*Buick*, 436 F.3d 284, 289-90 (1st Cir. 2006) (quotation and internal citation omitted).

### 1.      The Timeliness of Plaintiff's Failure-to-Promote Claims

The parties have expended considerable effort debating the timeliness of plaintiff's failure-

to-promote claims.  National Grid contends that any failure-to-promote claims under Title VII

arising before July 8, 2005, and any failure-to-promote claims under § 1981 arising before April

20, 2004, are time-barred.  (Def.'s Mem. at 10-11).  McLaughlin does not dispute the July 8,

2005, date as it relates to discrete and independently cognizable acts of discrimination under Title

VII, but argues that the applicable date under § 1981 is April 20, 2003.  (Pl.'s Opp. at 7-9).

In the Court's view, the dispute is immaterial.  In order to make out a failure-to-promote

claim under either Title VII or § 1981, McLaughlin must actually have applied for the promotion.

*Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005).  In the motion for summary judgment

and associated filings, three such applications are specifically identified:  the Glens Falls Position

and the two Glenmont Positions.  (*Compare* Def.'s St. ¶¶ 24, 42 *and* Pl.'s Resp. ¶¶ 24, 42, *with* Pl.'s Opp. at 2-6).  At other places in his papers, McLaughlin vaguely asserts that he applied for additional positions at various other times.  (Pl.'s Opp. at 7 (claiming he was denied promotions in 2002 and 2003); *id.* at 10 (claiming he was denied promotions in 2007, 2008, and 2009)).  But he never specifically identifies any relevant facts about those applications—for example, what the position was, when he applied, who the decision-maker was, whether or not he was interviewed, the reasons given for denial, or the race of the successful applicant.  Indeed, apart from a few oblique references to these unnamed and unidentified applications, McLaughlin does not discuss them in his opposition.  (*Id.* at 7, 10, 11).[15]  That is not sufficient to preserve the claim.

Accordingly, for purposes of McLaughlin's claims under Title VII and § 1981 for failure to promote, the Court will consider only his applications for the Glens Falls Position and the two Glenmont Positions.  Those claims are clearly timely.  (Def.'s Mem. at 10-11).[16]

## 2.    The *Prima Facie* Case

To establish a *prima facie* case of race discrimination, McLaughlin must show that (1) he is a member of a protected class, (2) he was qualified for an open position for which he applied, (3) he was rejected, and (4) someone possessing similar qualifications filled the position instead.

---

[15] In National Grid's statement of material facts and McLaughlin's response, the parties also identify a Gas Technical Trainer position that was posted in June 2004.  (Def.'s St. ¶ 18; Pl.'s Resp. ¶ 18).  McLaughlin's opposition papers, however, do not so much as mention the Gas Technical Trainer position, even in the statement of facts.  (*See* Pl.'s Opp. at 2-21; *see also* Def.'s Reply at 4 n.3).  McLaughlin has therefore waived any argument that the failure to hire him as a Gas Technical Trainer in 2004 was a discrete act of discrimination actionable under either Title VII or § 1981.  *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("By failing to make this argument in his opposition to summary judgment, [plaintiff] has failed to preserve this claim. . . . If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived." (quotation omitted)).

[16] Although the Glens Falls Position was posted in June 2005, McLaughlin interviewed for the job on July 25, 2005, and the decision to hire Krough was made sometime thereafter.  (*See* App. at 84, 88).  Thus, it is undisputed that the alleged discriminatory act—the failure to promote—occurred *after* July 8, 2005.

*See Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005).  For the purposes of summary

judgment, National Grid concedes that McLaughlin has established a *prima facie* case of

discrimination as to its decision not to hire him for the Glens Falls Position or the two Glenmont

Positions.  (Def.'s Mem. at 11-12).

### 3.       The Proffered Legitimate, Non-Discriminatory Reason

The burden then shifts to National Grid to articulate a legitimate, non-discriminatory

reason for its failure to promote McLaughlin on the three occasions in question.  *See Ingram*, 414

F.3d at 230.  The parties do not dispute that National Grid has articulated such a reason:  It

asserts that he was not promoted because other candidates were more qualified and McLaughlin

interviewed poorly.  (Def.'s Mem. at 12-13).  The Court will therefore turn to the third issue:

whether McLaughlin can demonstrate that National Grid's stated reason for its decision is a

pretext for discrimination.

### 3.       Pretext for Discrimination

At the third stage of the analysis, the burden shifts back to the employee to show that the

employer's proffered reason is "'a coverup' for a 'discriminatory decision.'"  *Feliciano de la Cruz*

*v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir. 2000) (quoting *McDonnell*

*Douglas*, 411 U.S. at 805).  In making this showing, the employee must demonstrate both that the

articulated reason is "a pretext and that the true reason is discriminatory."  *Santiago-Ramos v.*

*Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (quoting *Thomas v. Eastman*

*Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999)).  "Plaintiffs may use the same evidence to support

both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably

to infer that unlawful discrimination was a determinative factor in the adverse employment

17

action." *Thomas*, 183 F.3d at 57.  When considering evidence of pretext, the Court must keep in

mind that "courts should exercise particular caution before granting summary judgment for

employers on such issues as pretext, motive, and intent."  *See Santiago-Ramos*, 217 F.3d at 54.

In the present case, McLaughlin seeks to establish pretext in three ways.

First, he contends that National Grid misrepresented his employment record and

qualifications.  (Pl.'s Opp. at 12).  A plaintiff can "establish pretext by showing 'weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted

non-discriminatory reasons.'"  *Id.* at 56 (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d

151, 168 (1st Cir. 1998)).  Here, the only example McLaughlin offers of a misrepresentation of

his credentials is that, at the time of the Glens Falls interview, Ackerman believed McLaughlin's

experience was too limited for the broader responsibilities of a Gas Operations Supervisor.  (App.

at 80).  Specifically, McLaughlin was told that "one of the primary reasons [he] was not selected

for the promotion was on account of [his] alleged lack of 'field experience' and that [his]

experience was solely related to 'sniffer trucks.'" (McLaughlin Aff. ¶ 35).[17]  According to

McLaughlin, this unfairly minimizes his field experience, which he contends was extensive.  He

points out that he held a position in Gas Ops for approximately seven years before moving to the

Gas Supply Department in 2001 and that he obtained a great deal experience in the field during

that time.  (*Id.* ¶ 8, 10, 37; App. at 4-10).

Even assuming the truth of McLaughlin's claim—that is, that National Grid unfairly

---

[17] Although defendant contends that this statement is hearsay, it plainly is not offered for its truth.  To the
contrary, plaintiff claims the statement is *not true*.  Furthermore, and in any event, it is a statement of a party-
opponent within the meaning of Fed. R. Evid. 801.

undervalued his knowledge of field operations—the undisputed evidence shows that field work is only a narrow subset of the duties of a Gas Operations Supervisor must oversee.  As noted, a Gas Operations Supervisor must also supervise, plan, schedule, and coordinate the work of employees engaged in the operation, construction, and maintenance of gas facilities, as well as monitor gas operation, construction, and maintenance activities to ensure compliance with National Grid's standards and operating procedures.  (App. at 84, 99, 107; Pl.'s Resp ¶ 26-27).  It is uncontested that plaintiff did not have such a broad range of experience, whereas Krough, Cianfarani, and Savona all had experience managing, training, and/or supervising crews of employees in addition to their field and technical experience.  (App. at 80-81, 101-02, 119-20, 143-44; Pl.'s Resp. ¶ 40).

Second, McLaughlin attempts to cast doubt on National Grid's proffered reason by pointing to the deposition testimony of Gary Stevens.  (Pl.'s Opp. at 12).  According to McLaughlin, Stevens testified that the work of employees in Gas Ops has not changed substantially from 1983 until today.  (*Id.* at 2, 12).  If McLaughlin was familiar with those responsibilities when he worked in Gas Ops from 1994 until 2001, the argument goes, he is familiar them today.

But Stevens' testimony is not so far-reaching.  When asked what the differences are in the duties and responsibilities of a Gas Mechanic Helper today as compared to 1983, Stevens responded, "Roughly they're the same."  (Dkt. No. 43-5, Stevens Dep. at 5).  Even accepting this as true, it does not serve to demonstrate pretext.  Gas Operations Supervisors, it is uncontested, have considerably more responsibilities than supervising Gas Mechanic Helpers, even if McLaughlin was once a Gas Mechanic Helper and even if that job still exists in roughly the same form.

Third, McLaughlin contends that Ackerman misrepresented the answers he gave during the Glens Falls interview. (Pl.'s Opp. at 13). According to Ackerman, McLaughlin gave a number of answers that were unresponsive or unrelated to the job criteria. (App. at 79-80, 88-97). McLaughlin responds that the written notes provided by Ackerman are an incomplete and inaccurate record of the interview, and that they neglect many of the good answers he did provide. Moreover, he contends that National Grid has failed to provide other candidates' answers in order to facilitate a comparative evaluation. (Pl.'s Opp. at 13).

Neither contention is persuasive. Even if the notes are incomplete, McLaughlin has made no effort whatsoever to fill in the gaps—that is, he has not articulated what answers he claims are missing from the record. (*Id.* at 13). Indeed, he provides nothing more than the following conclusory assertion: "I do[] not accept that the notes . . . are accurate summaries of [my] actual answers [and I] contend[] that the written record of [the] interview contains only portions of [my] answers rather than a complete record of [my] answers to each question." (*Id.*). In addition, while it might be helpful to compare his answers to those of successful applicants, McLaughlin has not claimed that National Grid destroyed the records or improperly refused to reply to a discovery request for such records. (*Id.* at 13-14). Accordingly, no adverse inference can be drawn from the lack of such materials in the record.[18]

McLaughlin's failure to undermine the accuracy of Ackerman's record of the Glens Falls interview is particularly significant. Importantly, McLaughlin was told only that "*one* of the

---

[18] McLaughlin contends that because Zielinski relied on McLaughlin's interview with Ackerman when deciding not to interview him for the Glenmont Positions, that decision is similarly tainted. This argument succeeds, however, only if Ackerman's notes are incomplete and inaccurate. For the reasons stated, McLaughlin has not provided sufficient evidence as to that point.

primary" justifications for not being promoted was that his work experience was too limited. (McLaughlin Aff. ¶ 35 (emphasis added)).  But National Grid also contends that its decision was also based on McLaughlin's poor interview performance—a justification as to which there is no genuine dispute of material fact on this record.  (App. at 79-80, 88-97).  Thus, even if National Grid's minimization of McLaughlin's field experience was pretextual, McLaughlin has offered no evidence to undermine the contention that he did not interview nearly as well as the successful candidates.  The "limited experience" justification for denying McLaughlin a promotion is not sufficiently implausible, inconsistent, or otherwise problematic to warrant a reasonable inference of discrimination, particularly when measured against the undisputed "poor interview" justification.

Ultimately, McLaughlin's three rationales are insufficient, individually or collectively, to meet his burden of showing pretext as to his failure-to-promote claims.  McLaughlin does not have any evidence of disparate treatment as to promotions, "[t]he most probative means of establishing . . . pretext for discrimination." *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997).  He does note that Savona was reported to have used the word "nigger" in the company of African-American co-workers, (McLaughlin Aff. ¶ 40, 42, 45), and that Savona was eventually transferred after a co-worker complained that he had made racially inappropriate comments.  (App. at 123).  These incidents, however, occurred *after* Savona was selected instead of McLaughlin.  (McLaughlin Aff. ¶ 46; App. at 123).  Savona obviously was not the individual responsible for hiring himself.  While statements made by "one who neither makes nor influences [a] challenged personnel decision are [generally] not probative in an employment discrimination case," *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990), "evidence of

a company's general atmosphere of discrimination may be considered *along with any other evidence bearing on motive* in deciding whether a Title VII plaintiff has met [his] burden of showing that the defendants' reasons are pretexts." *Santiago-Ramos*, 217 F.3d at 55 (emphasis in original) (quotation and internal citation omitted).  Here, as noted, there is no suggestion that the decision-makers, at the time the decisions were made not to promote McLaughlin, knew that Savona was likely to make racist comments, or that the promotion process was otherwise racially tainted.

The Court concludes, after "viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor," that McLaughlin has not proffered sufficient evidence to show that the three failures-to-promote were the product of unlawful racial discrimination.  *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir. 2000) (quotation and internal citation omitted).  Accordingly, the motion for summary judgment will granted insofar as McLaughlin claims that he was not promoted because of race in violation of Title VII and § 1981.

### D.   <u>Discrimination in the Internal Investigation</u>

McLaughlin also contends that National Grid's investigation of his discrimination complaint was an independently discriminatory act under Title VII and § 1981.  (Pl.'s Opp. at 14-16).  On that issue, his claim is sufficient to survive summary judgment.

Again, National Grid appears to concede—at least for purposes of summary judgment—that McLaughlin has made a *prima facie* case of discrimination as to the internal

investigation.[19]  (Def.'s Mem. at 14).  It is also conceded that National Grid has articulated a

legitimate, non-discriminatory reason for conducting its investigation as it did:  National Grid

states that it followed its standard procedures, heard McLaughlin's side of the story, and

reasonably concluded that his supervisors had acted appropriately.  *See Azimi v. Jordan's Meats,*

*Inc.*, 456 F.3d 228, 246 (1st Cir. 2006) (no liability for discrimination where "the company

undertook a reasonable investigation, heard his side of the story, and decided that his accuser's

was more credible").  What remains is the question of pretext.  *See Straughn,* 250 F.3d at 34.

As proof of pretext, McLaughlin offers two principal pieces of evidence:  (1) the fact that

Dennis Flood helped to run the investigation, which (he contends) was a conflict of interest

because he had previously been involved in the decision not to hire McLaughlin for the Glens

Falls Position; and (2) the statement of Wanda Grace, who also ran the investigation, and who (he

contends) said upon the conclusion of the inquiry:  "Manch, I'm just gonna tell it to you like it is. .

. . Every time black people don't get the position that they think they deserve, the first thing they

cry is discrimination."  (McLaughlin Aff. ¶ 57; App. at 113-14).

Although the evidence is very thin, it is sufficient to survive summary judgment.  *See*

*Santiago-Ramos*, 217 F.3d at 55 ("One method [of showing pretext] is to show that

discriminatory comments were made by the key decisionmaker or those in a position to influence

the decisionmaker.").  A jury might reasonably infer that an investigation was not independent or

valid if it were conducted by a person who participated in one of the challenged decisions.  And

---

[19] National Grid does not argue that a sham internal investigation cannot qualify as an adverse
employment action.  (*See* Def.'s Mem. at 14).  Although National Grid contends that nothing about the
investigation was improper, the only case it cites in support of its one-paragraph argument concerns the pretext
inquiry under the *McDonnell-Douglas* burden shifting analysis.  (*Id.* (citing *Azimi v. Jordan's Meats, Inc.*, 456
F.3d 228, 246 (1st Cir. 2006))).  It is clear, therefore, that National Grid's argument is that McLaughlin has not
provided sufficient evidence of pretext.

while there are certainly innocent explanations for the comment of Ms. Grace, there is a factual dispute as to exactly what was said.[20]  McLaughlin is therefore entitled to a trial on that portion of his discrimination claims.

###    E.    Retaliation Claims

Finally, McLaughlin alleges that National Grid unlawfully retaliated against him because he filed an internal grievance and an EEOC charge alleging discrimination.  Again, McLaughlin seeks relief under both Title VII (Count IV) and 42 U.S.C. § 1981 (Count VI).  He contends that he was retaliated against in two ways:  by being unfairly disciplined and by being subjected to a hostile work environment.

Claims of retaliation brought pursuant to Title VII and those brought pursuant to § 1981 are subject to the same legal analysis.  *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). In considering a retaliation claim, the Court employs a three-step burden-shifting framework similar to that applied above.  To establish a *prima facie* case of retaliation, plaintiff must establish (1) that he engaged in protected conduct; (2) that he suffered an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. *Prescott*, 538 at 43.  Once plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Azimi*, 456 F.3d at 242.  If it does so, the plaintiff can only prevail by showing that the proffered reason was a pretext for the employer's retaliatory animus.  *Id.*; *see Stephens*, 569 F.3d at 786-87.

---

[20] The Court is cognizant that there are significant dangers in denying summary judgment in this context, both in terms of chilling open dialogue of racial issues in the workplace and rewarding hypersensitivity to perceived racial insults.  Nonetheless, the Court cannot assume that Grace's version of events is necessarily true.

1.        **Retaliatory Discipline**

McLaughlin first contends that he was retaliated against for complaining about alleged discrimination.  As to the *prima facie* case of retaliation, it is apparently undisputed (1) that he engaged in protected conduct (his internal and EEOC complaints of discrimination) and (2) that he suffered an adverse employment action (he was given a formal oral reminder that was documented in his file and a negative performance review).[21]  The first question, then, is whether the circumstances suggest that his protected activity was causally related to these adverse employment actions for purposes of establishing a *prima facie* case.

"[T]he prima facie burden in this context is not an onerous one."  *Calero-Cerezo*, 355 F.3d at 26.  Moreover, "[t]emporal proximity is but one method of proving retaliation."  *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003).  Changes in the way the employer treated the employee after the protected conduct occurred can also establish a causal connection.  *Id.*

Here, McLaughlin has put forth sufficient evidence to establish an inference of causation. He filed an internal complaint on September 23, 2005, which was followed by a formal oral reminder on March 27, 2006.  He filed an EEOC complaint on May 4, 2006, which was followed by a negative performance review on May 29, 2006.  The temporal proximity of these events provides the required inference of causation for a *prima facie* case of retaliation.

National Grid has responded by articulating a legitimate, non-retaliatory reason for the

---

[21] National Grid does not deny that the filing of an internal complaint alleging unlawful discrimination qualifies as protected conduct.  *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, (9th Cir. 2009) (concluding that an employee's internal complaints to human resources about supervisors' discriminatory comments qualified as "protected activity" under the antiretaliation provision of Title VII).

oral reminder and negative review.  *See Azimi*, 456 F.3d at 242.  It contends that the oral reminder and performance review were justified because McLaughlin was underperforming.

Although the evidence again is thin, the Court ultimately concludes that McLaughlin has supplied sufficient evidence of pretext.  As noted, "[o]ne method [of showing pretext] is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker."  *Santiago-Ramos*, 217 F.3d at 55.  Here, McLaughlin notes that Savona—who played a decision-making role as to both the oral reminder and performance review—was transferred from Glenmont in 2008 after an African-American employee complained that Savona had made discriminatory comments to him and repeated them in the presence of two other African-American employees.  Savona does not deny making the statements, although he disputes their implication.  (App. at 123; Pl.'s Resp. ¶ 122).[22]  These statements, even though they were made in 2008, are at least some evidence that Savona had a discriminatory animus, which would support an inference that his explanations for the actions he took concerning McLaughlin were pretextual.  In addition, there is evidence that although other employees had mistakes on their leak cards, McLaughlin was the only employee to receive an oral reminder.  (App. at 122; Pl.'s Resp. ¶ 98).  McLaughlin also contends that he had never received a negative performance evaluation until 2006.  (McLaughlin Aff. ¶ 122).

Although the evidence is far from overwhelming, the Court concludes that McLaughlin

---

[22] National Grid has moved to strike the paragraphs of McLaughlin's affidavit dealing with these statements, alleging they are based on hearsay.  (McLaughlin Aff. ¶ 41-42).  As noted, Savona said to Hardy something to the effect of, "you scared me with your smile,"and repeated a similar comment a few days later.  (App. at 123.; Pl.'s Resp. ¶¶ 122, 124).  Savona, who was McLaughlin's supervisor, is an agent of National Grid, and his statements therefore are statements of a party-opponent and excluded from the definition of hearsay.  *See* Fed. R. Evid. 801(d)(2)(D).  Savona admits to making some form of these statements in an affidavit submitted by National Grid, and the Court may therefore presume he would testify consistently at trial.  (App. at 123).

has provided sufficient evidence of pretext to survive summary judgment on that aspect of his retaliation claim.

### 2.    Hostile Work Environment

McLaughlin further alleges that he was subjected to a hostile work environment in retaliation for his complaints of discrimination.  (Pl.'s Opp. at 16-17).  In order to make out a hostile work environment claim, McLaughlin must show that (1) he is a member of a protected class; (2) he experienced uninvited harassment; (3) the harassment was racially-based; (4) the harassment was so severe or pervasive as to create an abusive work environment; and (5) the harassment was objectively and subjectively offensive.  *Prescott*, 538 F.3d at 43.  National Grid disputes only that McLaughlin has presented sufficient evidence of racially-based harassment that was severe or pervasive.  It concedes, for purposes of summary judgment, the other three elements.  (Def.'s Mem. at 15-19).

McLaughlin has proffered evidence sufficient to survive summary judgment that the harassment to which he was subjected was racially-based.  In particular, McLaughlin points to the incident involving the stuffed gorilla that was placed in the Glenmont locker room in May 2007.  (McLaughlin Aff. ¶ 114; App. at 68-69, 140).  Although National Grid contends that the gorilla had absolutely nothing to do with race, it would not necessarily be unreasonable for a jury to conclude otherwise.  *See Jordan v. Alternative Resources Corp.*, 458 F. 332, 350 (4th Cir. 2006) ("It is plain that a reference to our African-American fellow citizens as 'monkeys' reflects the speaker's deep hostility towards them-on the sole basis of their color.").  Under the circumstances, summary judgment on the hostile work environment claim will be denied.

In addition, McLaughlin has met his burden of showing a severe or pervasive work

27

environment.  "There is no mathematically precise test [the Court] can use to determine when this burden has been met."  *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006) (quotation omitted).  Instead, the Court "evaluate[s] the allegations and all the circumstances, considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance."  *Id.*  The incident described was a single incident, and thus not frequent.  Nor was it physically threatening.  It was, however, potentially objectively humiliating and much more than a "mere offensive utterance."  While the issue is hardly free from doubt, a reasonable jury could conclude that McLaughlin was subjected to severe or pervasive harassment.  Summary judgment will therefore be denied on the hostile work environment retaliation claim.

## IV.   **Conclusion**

For the foregoing reasons, defendant's motion to strike is DENIED as moot, and defendant's motion for summary judgment is GRANTED in part and DENIED in part.  McLaughlin's discrimination claims based on failure-to-promote are dismissed.  The remainder of his claims may proceed to trial.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  March 31, 2010